UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DELAUREN GORDON,

       Petitioner,                Case No. 2:06-cv-246

v.                                 Honorable Robert Holmes Bell

GERALD HOFBAUER,

       Respondent.

_____/

## **REPORT AND RECOMMENDATION**

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. On February 12, 2004, after a jury trial, Petitioner was convicted in the Mecosta County Circuit Court of felony murder, MICH. COMP. LAWS § 750.316; conspiracy to commit armed robbery, MICH. COMP. LAWS § 750.157a; possession of a firearm by a felon, MICH. COMP. LAWS § 750.224f; and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b. Petitioner was sentenced as a second habitual offender, MICH. COMP. LAWS § 769.10, to concurrent terms of life imprisonment for felony murder and conspiracy to commit armed robbery, 47-90 months for possession of a firearm by a felon, and a consecutive term of two years for possession of a firearm during the commission of a felony. In his *pro se* petition, Petitioner raises two claims for relief:

    I.      Was defendant deprived of effective assistance of counsel by his attorney's failure to request a jury instruction regarding the reliability of accomplice testimony as to Eli Evans?

    II.     Was defendant deprived of effective assistance of counsel by counsel's failure to object to the court's instruction that Mr. Stewart faced a possible penalty of four years in prison as a result of charges against him about which he made an agreement with the prosecutor?

Respondent has filed an answer to the petition (docket #9) maintaining that the petition should be dismissed for lack of merit. Upon review, and applying the AEDPA standards, I find that the petition is without merit. Accordingly, I recommend that the petition be denied.

Petitioner's state prosecution arose from the March 11, 2003, shooting death of Jeremiah Monroe at his home in Big Rapids, Michigan. The prosecution claimed that Petitioner, Marvin Redmond, Shannon Keys and Eli Evans conspired to rob Monroe. The first attempt failed. The following day, Petitioner, Redmond and Keys made a second attempt without Evans' participation. During this attempt, Petitioner fatally shot Monroe. Petitioner was tried before a jury in the Mecosta County Circuit Court in February of 2004.[1]

Elizabeth Murawski, Jeremiah Monroe's mother, testified that at the time of his death Monroe was 21 years old, was unemployed, and she suspected he was involved in using and selling drugs. (Tr. I, 24-25). He was living with Earl Stewart. (Tr. I, 25).

Gale Mortensen, who oversaw the rescue division of the Big Rapids, Michigan, Department of Public Safety, testified that he was dispatched to Monroe's house on the morning of March 12, 2003. (Tr. I, 51). There were no police officers present when he arrived. (Tr. I, 52). He observed Monroe lying in the hallway and shell casings lying near his body. (Tr. I, 54).

Jeff Jennings, a sergeant for the Big Rapids Department of Public Safety, was also dispatched to the victim's home. Upon entering, he observed Earl Stewart and his girlfriend standing in Mr. Stewart's bedroom watching the paramedics. (Tr. II, 103).

---

[1]Transcripts of the eight days of trial proceedings will be designated as follows:

| | | |
|---|---|---|
| Tr. I   Feb. 2, 2004 | Tr. IV   Feb. 5, 2004 | Tr. VII   Feb. 11, 2004 |
| Tr. II   Feb. 3, 2004 | Tr. V   Feb. 6, 2004 | Tr. VIII   Feb. 12, 2004 |
| Tr. III   Feb. 4, 2004 | Tr. VI   Feb. 10, 2004 | |

Lilbourne Stewart testified that he was known as Earl and Black. He lived with Monroe. Monroe was "like family" to Stewart. (Tr. II, 148). He did not know Petitioner. (Tr. II, 148). Stewart, Keys and Monroe, and others he did not know, spent March 11, 2003 shooting dice and playing video games. (Tr. II, 153). In the evening, Monroe and Keys left to go to the casino. Stewart and his girlfriend smoked marijuana and went to sleep. (Tr. II, 155). Later, he heard banging on his bedroom door. When he opened the door, he saw Monroe lying on the floor saying he was dying. Stewart called 911. (Tr. II, 158).

Stewart also testified that he had been given immunity for controlled substances that were found in his room on the evening of the killing. (Tr. II, 145). He stated that he had been charged with possession of those substances and that those charges had been dismissed. (Tr. II, 145-46). During Stewart's testimony, the Court explained to the jury:

> So the jury panel understands, I wanted to make that clear, because he talked initially about controlled substances. And that's what the problem was. He was charged with them. And they dismissed those charges and gave him immunity. But now the immunity just doesn't go to that controlled substance incident. It goes to anything that he talks about here today. So you understand that, it goes to the incident that we're talking about, it goes to controlled substances. Anything he says, he has immunity, and it can't be used against him as a charge, as a criminal charge.

(Tr. II, 147).

Stewart's girlfriend, Jalaea Cheree Vaughn, testified that on March 11, 2004, she was visiting Stewart. Monroe, Shannon Keys, and a black man whose name she did not know were shooting dice and playing video games. (Tr. II, 116). While Ms. Vaughn and Stewart were sleeping, she heard a knock on the bedroom door. She awakened Stewart. (Tr. II, 122). When Stewart opened the door, Ms. Vaughn observed Monroe lying in the hallway. She heard him saying "I'm

dying," and he was bleeding and gasping for air. (Tr. II, 123-24). Ms. Vaughn noticed that the front door was open. (Tr. II, 124).

Doctor David Start, the forensic pathologist who performed the autopsy on Monroe, testified to three gunshot wounds to Monroe's back and neck. (Tr. II, 7). He opined that the shooter was no further than four feet from Monroe and no closer than six inches. (Tr. II, 11).

The prosecution's key witness, Marvin Redmond, testified that Shannon Keys was a long-time friend. He and Keys had occasionally purchased cocaine from Monroe. They discussed robbing Monroe, and concluded that if they robbed Monroe he would not notify the police because they would be stealing drug money. They also concluded that Redmond's brother, Eli Evans, would be an appropriate partner in the robbery scheme because he was large and intimidating and had a "stable mind" so he would not hurt or kill anyone. On March 10, 2003, Redmond and Keys drove to Lansing to meet with Evans. When they arrived, Petitioner was at Evans' apartment. The four men discussed robbing Monroe. They decided that Petitioner and Evans would actually commit the robbery, and Redmond and Keys would wait in the car. With the plan in place, the men drove back to Big Rapids. Redmond observed Petitioner place a gun in the console next to the passenger's seat. During the drive they discussed the robbery, and concluded that if there was any resistance, Petitioner and Evans should simply leave Monroe's apartment. (Tr. IV, 204). The gun was to be used only as a scare tactic. (Tr. IV, 205). At approximately four o'clock in the morning of March 11, after stopping at Keys' home to collect duct tape and a camouflage mask, they drove to Monroe's residence. While Redmond and Keys waited in the car, Redmond observed Petitioner and Evans knock on the front door of Monroe's residence. When there was no answer, the men left. Keys and

Petitioner telephoned Monroe until five o'clock in the morning, but received no answer. At that time, the men abandoned the robbery plan and returned home. (Tr. IV, 4-5, 8-9).

Later in the morning of March 11, Keys informed Redmond that he intended to spend the day with Monroe shooting dice and gambling, thus ensuring that Monroe would be at home. That evening, Redmond, Evans and Petitioner planned to commit the robbery. (Tr. IV, 13). However, when Evans returned from work that afternoon, he informed Redmond that he would no longer participate in the robbery. (Tr. IV, 13). Keys, Redmond and Petitioner decided to carry out the plan without Evans. Petitioner would enter Monroe's house alone. (Tr. IV, 13). As planned, Keys drove to Muskegon and spent the day gambling with Monroe. Redmond and Petitioner drove to Big Rapids that evening. (Tr. IV, 15). They first stopped at Meijer's and purchased a dog muzzle and rawhide bone in case Monroe's dog presented any problems. Redmond then dropped Petitioner off near Monroe's house, and Redmond began driving around the neighborhood. (Tr. IV, 36). Approximately ten minutes later, Redmond saw Petitioner leaving Monroe's house and running down the street. (Tr. IV, 37). Redmond stopped the car, and Petitioner got in. (Tr. IV, 37). Petitioner stated that they should get out of town and back to Lansing as quickly as possible because Monroe had tried to grab his gun and he shot him. (Tr. IV, 38-39). Petitioner was not certain if he had killed Monroe, but believed Monroe "wasn't going to make it." Redmond and Petitioner drove back to Lansing. (Tr. IV, 40).

Redmond also testified that he had been charged with felony murder, conspiracy to commit armed robbery, felony firearm, and armed robbery. Pursuant to a plea bargain, he pleaded guilty to assault with intent to commit armed robbery, and all other charges were dismissed. (Tr. III, 177-79). He agreed to testify truthfully and was granted immunity. (Tr. III, 181).

Kathy Barnes testified that she is a store detective at Meijer's in Big Rapids. She identified a videotape that was played for the jury. The videotape showed an SUV in the Meijer's parking lot at 11:02 p.m. on March 11, 2003. (Tr. IV, 195-96). An in-store videotape showed a black man wearing gloves at a cash register at 11:11 p.m. (Tr. IV, 196). Meijer's computer records revealed that the man bought a dog muzzle and a rawhide dog bone. (Tr. IV, 197).

In lieu of testimony at trial, the parties stipulated to reading the transcript of Eli Evans' prior testimony in response to an investigative subpoena.[2] Petitioner agreed not to argue that by charging Evans the prosecution tried to prevent him from testifying. Petitioner also agreed to waive any claims on appeal regarding his inability to call Evans as a witness. (Tr. VI, 3-4). Evans testified that Redmond came to Lansing to help him move. He introduced Redmond to Petitioner, who also helped him move. (Investigative Subpoena, Oct. 3, 2003, 12-13, docket # 19). After the move was completed, the three men drove to Big Rapids to purchase marijuana. They drove Shannon Keys' truck, although Keys did not accompany them. There was no discussion of a robbery. (*Id.* at 42-44, 46-50). They went to a house in Big Rapids to make the purchase, but no one answered the door. They returned to Lansing. (*Id.* at 52). The following day, he saw Redmond and Petitioner. They were going back to Big Rapids, and asked him if he wanted to go with them. He said he did not. (*Id.* at 56). A few days later he saw Petitioner who said that he and Redmond had attempted a robbery and that Petitioner had shot the intended robbery victim because he grabbed

---

[2] Petitioner did not raise a claim on appeal in the Michigan appellate courts regarding the admission of Evans' deposition testimony based upon the Sixth Amendment or *Crawford v. Washington*, 541 U.S. 36 (2004). Nor does he raise such a claim in the present petition for habeas relief. The Court, however, notes that legal rights are generally subject to waiver by an agreement between the parties, *United States v. Mezzanatto*, 513 U.S. 196, 203 (1995), including the right to confront one's accuser, *id.* at 201, as long as the waiver is made knowingly and voluntarily. *Id.* at 203. At trial, Petitioner agreed not to raise any claims on appeal regarding the admissibility of Evans' testimony.

Petitioner's gun. On the day he drove to Big Rapids with Redmond and Petitioner, he did not see a gun and did not know of Petitioner owning a gun. (*Id.* at 89).

Later, during the questioning, Evans altered his testimony. He claimed that a month before the attempted robbery, Keys had stated to him and Redmond that he knew a white boy in Big Rapids that has a lot of money and drugs and would be an easy target for a robbery. (*Id.* at 92, 93, 95). Keys also said that they would not need to use a gun because the intended victim was always drinking. (*Id.* at 96). On the day the men drove to Big Rapids, they intended to commit a robbery. They stopped at the intended victim's house. Keys arrived in a separate vehicle. Evans and Petitioner went to the door, while Redmond and Keys drove around. When no one answered the door, they walked back to Redmond's automobile and drove back to Lansing. Evans went to work. (*Id.* at 50-53). After work, he saw Redmond and Petitioner who stated they were returning to Big Rapids and asked if he was going with them. He told them he was not going back. He explained that he did not want to face the possibility of going to jail because he had just had his first baby. (*Id.* at 91).

Petitioner testified on his own behalf, giving his version of what transpired on March 10 and 11, 2003. On March 10, he and his girlfriend did a few errands and spent the rest of the day at home alone watching videos. (Tr. VII, 66). Petitioner testified that he lived in the same apartment complex as Eli Evans, and that he was acquainted with Evans as he had purchased marijuana from him. (Tr. VII, 61-62). On March 11, 2003, Evans asked Petitioner to help him move some furniture later in the day. (Tr. VII, 62). After approximately an hour, Petitioner observed Marvin Redmond, whom he did not know, driving around the complex parking lot in a flashy truck. Petitioner flagged him down to ask him if he knew where Petitioner could buy some marijuana. (Tr. VII, 64). Evans

approached and introduced Redmond as his brother. The men moved furniture for approximately 30 minutes. (Tr. VII, 67-68). Later that evening, he borrowed four hundred dollars from his girlfriend and left town with Redmond, believing they were going to Big Rapids to purchase marijuana. (Tr. VII, 72). When they arrived in Lansing, Redmond stopped at Meijer's and asked Petitioner to go inside and buy him a dog muzzle and dog bone for his dog, which Petitioner did. (Tr. VII, 73). They then went to Papa John's restaurant where Redmond spoke to one of his associates about trading cars. (Tr. VII, 75). They went to Redmond's house, where Redmond fell asleep on the couch and Petitioner played video games. (Tr. VII, 77). Later, they went to Monroe's house, but Monroe was not at home. Petitioner was fed-up and asked Redmond to drive him back to Lansing. (Tr. VII, 80). Redmond took him home and left. (Tr. VII, 81). Petitioner never saw nor spoke to Redmond again. (Tr. VII, 89, 104). Moreover, he had never known Shannon Keys. (Tr. VII, 89, 104).

During his closing argument, the prosecutor conceded that Evans' testimony consisted of perjury for the "first three quarters of it," (Tr. VIII, 11), and that Evans' entire testimony "is suspect." (Tr. VIII, 12). Petitioner's counsel repeatedly argued during his closing argument that Evans was not a credible witness. (Tr. VIII, 51, 56, 63-64, 66-67, 69-70).

The trial court instructed the jury with regard to Redmond's testimony:

> This witness is an undisputed accomplice. Marvin Redmond says he took part in the crime that the defendant is charged with committing. . . . Now, a cautionary instruction regarding accomplice testimony. You should examine an accomplice's testimony closely and be very careful about accepting it. You may think about whether an accomplice's testimony is supported by other evidence, because then it may be more reliable. However, there is nothing wrong with the prosecutor's using an accomplice as a witness. You may convict the defendant based only on an accomplice's testimony if you believe the testimony and it proves the defendant's guilt beyond a reasonable

> doubt. . . . In general, you should consider an accomplice's testimony more cautiously than you would that of an ordinary witness. You should be sure you have examined it closely before you base a conviction on it.

(Tr. VIII, 100-01). Petitioner's counsel did not request an accomplice instruction regarding Evans' testimony.

> The trial court instructed the jury with regard to Stewart's testimony:
>
> You have heard testimony from a witness Lilbourne, Earl, Black, Lilbourne Stewart, that he made an agreement with prosecutor about charges against him in exchange for his testimony at this trial. You have heard evidence that Lilbourne Stewart faced a possible penalty of four years in prison as a result of those charges.
>
> You are to consider this evidence only as it relates to Stewart's credibility and as it may tend to show his bias or self-interest.

(Tr. VIII, 102-03).

Petitioner filed an application for leave to appeal in the Michigan Court of Appeals, raising the same two claims he has raised in his petition for habeas relief. (See Def.-Appellant's Br. on Appeal, docket #32.) In an unpublished opinion entered on July 14, 2005, the Michigan Court of Appeals affirmed Petitioner's conviction. (*See* 7/14/05 Mich. Ct. App. Ord. docket #32.)

Petitioner filed a delayed application for leave to appeal with the Michigan Supreme Court. Petitioner raised the same two claims raised before the Michigan Court of Appeals, as well as several new claims. On January 30, 2006, the Michigan Supreme Court issued an order denying Petitioner's application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* 1/30/06 Mich. Ord., docket #24.)

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The

AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). "Yet, while the principles of 'clearly established law' are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001). A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially

indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

Petitioner raises two ineffective assistance of counsel claims. In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance

of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. "When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'" *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697).

With regard to the performance prong of the inquiry, the defendant must show that counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of performance is highly deferential, and "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Therefore, this court should judge whether, in light of all the circumstances viewed at the time of counsel's conduct, counsel's "acts or omissions were outside

the wide range of professionally competent assistance." *Id.* at 690. Furthermore, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91; *see also Meeks v. Bergen*, 749 F.2d 322, 328 (6th Cir. 1984). Finally, when analyzing an attorney's performance, "[i]t will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that counsel rendered reasonable professional assistance." *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986) (quoting *Strickland*, 466 U.S. at 690).

As for the prejudice prong of the *Strickland* test, the Court instructed the "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The prejudice prong "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Therefore, the prejudice inquiry must not focus solely on mere outcome determination; attention must be given to "whether the result of the proceeding was fundamentally unfair or unreliable." *Id.* at 369.

Petitioner claims that his attorney was ineffective by failing to request a jury instruction regarding the reliability of accomplice testimony as to Eli Evans. Michigan's criminal jury instructions pertaining to accomplice testimony provides that an accomplice is a "person who

knowingly and willfully helps or cooperates with someone else in committing a crime." CJI2d 5.5. The jury instruction cautions jurors to "examine an accomplice's testimony very closely and be very careful about accepting it." CJI2d 5.6(1).

After citing the *Strickland* test applied by federal courts, the Michigan Court of Appeals found that while the evidence established that Evans was an accomplice to the first attempted robbery, it did not establish that he was an accomplice to the second robbery that resulted in Monroe's death. The Court further found that:

> [D]efendant is not able to establish the requisite prejudice. Substantial evidence of defendant's guilt was adduced beyond the testimony of Evans. *See People v. Young*, 472 Mich. 130, 143; 693 NW2d 801 (2005). Redmond's testimony was particularly harmful to defendant, and the court did give the accomplice jury instruction with regard to Redmond's testimony. Finally, as noted, the prosecutor acknowledged Evans' credibility problems, and the jury was instructed to consider whether a witness has "any bias, prejudice, or personal interest in how the case is decided when assessing credibility." *See Young*, 472 Mich. 144. Under these circumstances, defendant is unable to establish that there is a reasonable probability that the outcome of the trial would have been different had the instruction been given on counsel's request.

(7/14/05 Mich. Ct. App. Ord., 2).

Because "federal habeas corpus relief does not lie for errors of state law," federal courts may grant a writ of habeas corpus based on errors in state jury instructions only in extraordinary cases." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). The test is whether the challenged instruction "so infected the entire trial that the resulting conviction violates due process," *Cupp v. Naughten*, 414 U.S. 141, 147 (1973), not merely whether the instruction is undesirable, erroneous, or even universally condemned." *Id.* At 146; *see also Estelle v. McGuire*, 502 U.S. 62, 75 (1991) (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused

the trial with unfairness as to deny due process of law"); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000) (same).

Generally, a conspiracy to commit a crime is deemed to have continued as long as the purposes of the conspiracy have not been abandoned nor accomplished. *United States v. Holmes*, 293 F. App'x, 397-98 (6th Cir. 2008). A co-conspirator may withdraw from a conspiracy by taking some affirmative action to abandon the enterprise. *See United States v. Robinson*, 390 F.3d 853, 882 (6th Cir. 2004); *United States v. Brown*, 332 F.3d 363, 373-74 (6th Cir. 2003). Evans admitted that he was an accomplice to the first attempt to rob Monroe. He declined, however, to return to Big Rapids on March 12 to make a second attempt to rob Monroe. His testimony is supported by Redmond's testimony. Petitioner himself testified that Evans did not accompany the men to Big Rapids on March 12. Thus, because the evidence shows that Evans did not knowingly and willfully help or cooperate with Petitioner in committing the crimes that occurred on March 12 with which Petitioner was charged, he was not an accomplice to those crimes.

The prosecutor conceded during his closing argument that Evans' testimony amounted to perjury for the "first three quarters of it," (Tr. VIII, 11), and further, that the entire transcript of Evans' testimony at the investigative subpoena proceeding was "suspect." (Tr. VIII, 12). The prosecutor's admission regarding Evans' lack of credibility was far more persuasive in Petitioner's favor than the standard accomplice jury instruction, which merely directs the jury to consider an accomplice's testimony more cautiously than that of an ordinary witness . Moreover, any testimony Evans gave that implicated Petitioner was merely cumulative of Redmond's testimony, which the jury must have found credible in order to find Petitioner guilty.

Considering that it was not established that Evans was an accomplice to the charged crimes, trial counsel's failure to request an accomplice jury instruction regarding Evans' testimony was not outside the wide range of professionally competent assistance. Nor has Petitioner shown that but for counsel's failure to request an accomplice jury instruction as to Evans' testimony there is a reasonable probability that the result of the proceeding would have been different. The Michigan Court of Appeals' decision was neither contrary to clearly established federal law as determined by the Supreme Court of the United States nor based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, Petitioner is not entitled to habeas relief on this claim.

Petitioner claims that his attorney rendered ineffective assistance of counsel by failing to object to the trial court's erroneous statement that Stewart faced four years in prison as a result of charges of possession of cocaine when he actually faced a twenty-year maximum sentence. Petitioner contends that had the jury known Stewart actually faced twenty-years in prison, the jury might have concluded that Stewart had a compelling reason to testify falsely. The Michigan Court of Appeals found:

> Here, the trial court instructed the jury that the housemate was testifying in exchange for immunity from prosecution for a drug crime unrelated to the murder. However, the court erroneously indicated that the housemate would have faced a possible penalty of four years' imprisonment instead of twenty years' imprisonment. The housemate's testimony did not incriminate defendant in the uncharged drug crime and only corroborated a minor portion of Redmond's testimony. Given the weight of the evidence incriminating defendant in the crimes charged, we do not believe this error was outcome determinative. Therefore, we conclude that counsel's failure to seek clarification did not establish ineffective assistance.

(7/14/05 Mich. Ct. App. Ord., 3).

Petitioner's argument that the jury would conclude that Stewart would have been motivated to testify falsely if he had been facing twenty years' imprisonment, but not if he had been facing only four years, is purely speculative. Moreover, as the Michigan Court of Appeals noted, Stewart did not implicate Petitioner in the uncharged drug crime, nor, significantly, did he implicate him in Monroe's murder. He did not testify that Petitioner had been at the house earlier in the day, and he did not identify Petitioner as the shooter. Stewart's version of discovering Monroe's body after the shooter had left the house was fully supported by the testimony of his girlfriend and there was no evidence to the contrary. Even assuming that Petitioner's counsel was unreasonable in not requesting that the instruction be corrected to reflect the actual number of years of imprisonment that Stewart had faced, Petitioner has failed to establish that the error rendered the entire proceeding fundamentally unfair. The decision of the Michigan Court of Appeals was not contrary to clearly established federal law. Accordingly, Petitioner is not entitled to habeas relief on this claim.

In summary, the undersigned concludes that Petitioner's claims are without merit and therefore recommends that this Court dismiss the petition with prejudice.

In addition, if petitioner should choose to appeal this action, I recommend that a certificate of appealability be denied as to each issue raised by the petitioner in this application for habeas corpus relief. Under 28 U.S.C. § 2253(c)(2), the court must determine whether a certificate of appealability should be granted. A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is

warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, the undersigned has examined each of petitioner's claims under the *Slack* standard.

Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." The undersigned concludes that reasonable jurists could not find that a dismissal petitioner's first, second, and third claims was debatable or wrong. In his first claim, petitioner failed to allege the violation of a constitutional right. Similarly, petitioner failed to show that prejudice resulted from the alleged prosecutorial misconduct. Finally, petitioner failed to show that his sentence constituted an arbitrary and capricious abuse of discretion or that it was outside the statutory limit.

The undersigned recommends that the court deny petitioner's application on the grounds of procedural default with regards to petitioner's fourth and fifth claims. Under *Slack*, 529 U.S. at 484, when a habeas petition is denied on procedural grounds, a certificate of appealability may issue only "when the prisoner shows, at least, [1] that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and [2] that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Both showings must be made to warrant the grant of a certificate. *Id.* The undersigned concludes that reasonable jurists could not debate that petitioner's fourth and fifth claims are properly dismissed on the grounds of procedural default. With regards to each of these claims, petitioner has failed to show cause to excuse the default. "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the

district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." *Id.* Therefore, the undersigned recommends that the court deny petitioner a certificate of appealability.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).

          /s/ Timothy P. Greeley
          TIMOTHY P. GREELEY
          UNITED STATES MAGISTRATE JUDGE

Dated: July 10, 2009